KRAVITCH, Senior Circuit Judge, dissenting:

I agree that this court may review the decision of the district court refusing to approve the proposed consent decree, and accordingly I join Section III.A of the majority opinion.[1] Because I disagree with the majority's interpretation of the law and its resolution of the merits of the United States' appeal, I respectfully dissent from Section III.B of the majority opinion. My resolution of the merits necessitates review of the cross-appeal; I therefore do not join Section III.C of the majority opinion.

I.

A.

In its Order Denying Approval of the Settlement, the district court found that the United States had demonstrated a "valid basis for the race-conscious relief sought in the Agreement"[2] by

---

[1]  To supplement the majority's discussion of Carson's irreparable injury requirement, I add that to require the United States to litigate on the merits to resolve whether the seniority proposal is permissible would burden the class of discriminatees, see Carson v. Am. Brands, 450 U.S. 79, 89, 101 S. Ct. 993, 999 (1981) (stating that petitioners were harmed by inability to achieve "immediate restructuring of respondents' transfer and promotional policies"), undermine the policy of "make-whole" relief in Title VII cases, see Franks v. Bowman Transp. Co., 424 U.S. 747, 765-66, 96 S. Ct. 1251, 1265 (1976), and contradict the "strong preference for encouraging voluntary settlement of employment discrimination claims," Carson, 450 U.S. at 88 n.14, 101 S. Ct. at 998 n.14.

[2]  Order at 7.

demonstrating a "gross statistical disparity"[3] and thus establishing a prima facie case of discrimination.[4] The district court concluded, however, that it could not "bind non-consenting parties to a consent decree"[5] and, alternatively, that the proposed settlement agreement was not fair to incumbent employees.[6] The majority concludes that the district court was correct because a district court may not approve "a proposed consent decree . . . if it would affect the legal rights of the objecting parties." Because I believe that both rationales advanced by the district court were based upon incorrect interpretations of the law and that the majority rests its affirmance upon a similarly flawed basis, I would reverse the order refusing to approve the consent decree.

The majority relies upon White v. Alabama, 74 F.3d 1058 (11th Cir. 1996), and United States v. City of Miami, 664 F.2d 435 (Former 5th Cir. 1981) (en banc), for the proposition that "parts

---

[3] Id. at 9. The United States proffered statistical evidence in the affidavit of Marian Thompson, Ph.D., which showed, inter alia, that at the time of the fairness hearing in 1994 only one of the 235 members of the fire department was black; that none of the 124 entry-level firefighters was black; that only five of the 313 sworn police department employees were black; and that only four of the 240 entry-level police officers were black. See U.S. Reply Br. at 8; R. 2-18, attachment A at 2 n.1 and 8-9 n.4. The affidavit averred that the relevant labor market was either 17.2% black or 16.1% black, depending upon which definition of the labor market was used.

[4] Order at 8.

[5] Id. at 12-13.

[6] Id. at 15.

2

of [a] decree [that] affect [a] third party who did not consent to it . . . cannot properly be included in a valid consent decree." City of Miami, 664 F.2d at 442.

City of Miami, however, recognized that a consent decree can abridge the contractual rights of a nonconsenting party, as long as there has been a "trial or examination" before the district court to determine whether the remedy sought is justified by past discrimination. 664 F.2d at 447. In City of Miami, the challenged consent decree would have entitled members of the class of discriminatees who had not taken the civil service test to receive promotions ahead of employees who had taken and passed the test. The decree was challenged by employees who claimed that their collective bargaining rights would be impaired by the decree. The mandate of the court of appeals required modification of the decree to provide that it would not affect promotion rights of the objecting employees. The appellate court reasoned that the district court failed to find past discrimination by the City that would justify the remedies in the consent decree and, a fortiori, would justify an abridgment of the interests of non-consenting third parties. Id. at 447. The court stated:

> The right to promotion on the basis of test accomplishment may not be obliterated without a demonstration that the City has, in making promotions, discriminated against members of the affected classes in the past and that affirmative action is a necessary or appropriate remedy or that it has so discriminated in employment policy as to unfairly prejudice the opportunity of the affected class to achieve promotions.

3

Id. at 446-47 (Rubin, J., concurring). The court concluded that "[t]hose who seek affirmative remedial goals that would adversely affect other parties must demonstrate the propriety of such relief." Id. at 447. The court did not hold, however, that a consent decree that affects the contractual rights of nonconsenting parties categorically is unlawful. Rather, the court expressly held that a sufficient showing of past discrimination by the United States would justify relief sought on behalf of the discriminatees. See id. ("If, on remand, the United States shows that the City's practices have discriminated against individuals in or members of the affected class in such a way as adversely to affect their promotions, the district court shall fashion an appropriate remedy invoking its 'sound equitable discretion.'") (quoting Franks v. Bowman Transp. Co., 424 U.S. 747, 770, 96 S. Ct. 1251, 1267 (1976)).

Five years after the court decided City of Miami, the Supreme Court confirmed that a court may enter a consent decree despite the objections of a party to the action. In Local No. 93 v. City of Cleveland, 478 U.S. 501, 106 S. Ct. 3063 (1986), the Court held that an intervening union's consent was not required to obtain court approval of a consent decree that arguably affected the contractual rights of the union's members. As in the case before us, the class of plaintiff-discriminatees and the city in Local No. 93 agreed to enter a consent decree providing remedial relief --

4

including reserved planned promotions for minority employees and modification of the application of the seniority system to benefit discriminatees[7] -- to which the union objected. The Court stated:

> It has never been supposed that one party -- whether an original party, a party that was joined later, or an intervenor -- could preclude other parties from settling their own disputes and thereby withdrawing from litigation. Thus, while an intervenor is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree, it does not have power to block the decree merely by withholding its consent.

Id. at 528-29, 106 S. Ct. at 3079.[8] The Court was careful to distinguish between consent decrees that "impose[] obligations on a party that did not consent to the decree" or that dispose of a nonconsenting party's legal claims for relief, id. at 529, 106 S. Ct. at 3079 (emphasis added), and those that merely affect a

---

[7] The United States notes that the contested remedy in the case sub judice -- retroactive remedial seniority -- is less far-reaching than the remedy in Local No. 93, which was extended to individuals who were not actual victims of the City's discriminatory practices.

[8] The majority recites this language, yet renders it fully without content by reading this circuit's precedent to mean that "the objection of a party whose rights or claims would be adversely affected does bar a proposed consent decree." The majority relies upon City of Miami, decided five years before the Supreme Court's decision in Local No. 93. Even if City of Miami had held that a mere adverse effect upon contractual expectations of an objecting party were sufficient to preclude entry of an otherwise valid consent decree -- a reading of City of Miami that I believe is incorrect, see supra, Section I.A.-- that holding was overruled in Local No. 93. Although White, the only other Eleventh Circuit case relied upon by the majority, was decided after Local No. 93, a close reading of that case makes clear that it, too, is not inconsistent with Local No. 93 and does not support the majority's position. See infra.

5

nonconsenting party.  The Court explained:

> Of course, parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and a _fortiori_ may not impose duties or obligations on a third party, without that party's agreement.  A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors; if properly raised, these claims remain and may be litigated by the intervenor.  And, of course, a court may not enter a consent decree that imposes obligations on a party that did not consent to the decree.  However, the consent decree entered here does not bind Local No. 93 to do or not to do anything.  It imposes no legal duties or obligations on the Union at all . . . .

_Id_. at 529-30, 106 S. Ct. at 3079 (citations omitted).  Therefore, a consent decree that "does not bind [the non-consenting party] to do or not to do anything," _id._ at 529-30, 106 S. Ct. at 3079, and that does not impose any "legal duties or obligations" upon that party -- duties the breach of which could lead to "contempt of court for failure to comply with its terms," _id._ at 530, 106 S. Ct. at 3079 -- is not invalid.  Likewise, a decree that does not impermissibly dispose of the valid claims for relief of a nonconsenting party is lawful.

The consent decree at issue here, like the decree at issue in _Local No. 93_,[9] does not impose any legal obligations upon the

---

[9]  Contrary to the majority's contention, it appears that the intervening union in _Local No. 93_ asserted interests similar to those asserted by the intervenors here.  _See_ _Local No. 93_, 478 U.S. at 507, 106 S. Ct. at 3067 (noting that union contended that consent decree would "deny those most capable from [sic] _their_ promotions") (emphasis added); _Vanguards of Cleveland v. City of Cleveland_, 753 F.2d 479, 484-85 (6th Cir. 1985) (noting that union claimed that consent decree's affirmative action plan "penalizes innocent non-minority firefighters" and stating that "[s]ince non-

6

nonconsenting parties.  The appellees would not be required by the decree "to do or not to do anything."  Local No. 93, 478 U.S. at 530, 106 S. Ct. at 3079.  Nor do the objectors have any legal claims for relief that could be disposed of by the proposed consent decree.  Appellees became parties to this action solely to voice their views on the fairness of the settlement; they have at no time during this litigation asserted "a cause of action in [their] own right[,] and [they] could not prosecute reverse discrimination claims (of [their] members) that [have] not yet arisen." White v. Alabama, 74 F.3d 1058, 1075 n.53 (11th Cir. 1996); cf. Kirkland v. N.Y. State Dept. of Correctional Serv., 711 F.2d 1117, 1126 (2d Cir. 1983) (approving of district court's decision to let non-minorities intervene "for the sole purpose of objecting to the settlement"; stating that "although non-minority third parties allowed to intervene in cases which involve consent decrees or settlement agreements implementing race-conscious hiring or promotional remedies do have a sufficient interest to argue that the decree or agreement is unreasonable or unlawful, their interest in the expectation of appointment does not require their consent as a condition to any voluntary compromise of the litigation").

_____

minorities do not have a legally protected interest in promotions which could only be made pursuant to discriminatory employment practices, it follows that the legal rights of non-minorities will not be adversely affected by reasonable and lawful race-conscious hiring or promotional remedies") (emphasis in original), aff'd, Local No. 93, supra.

Instead, their argument is that their contractual rights will be adversely affected by the decree.

That argument, however, is foreclosed not only by Local No. 93, see 478 U.S. at 528, 106 S. Ct. at 3078-79 (holding that argument that "because the Union was permitted to intervene as of right, its consent was required before the court could approve the consent decree . . . misconceives the Union's rights in the litigation"), but also by the Supreme Court's opinion in Franks v. Bowman Transp. Co., 424 U.S. 747, 96 S. Ct. 1251 (1976), which stands for the proposition that a third party cannot block approval of a consent decree merely because the party will be "affected" by the decree.  In Franks, the Court held that retroactive competitive seniority relief -- the relief challenged in the case sub judice -- was necessary to ensure full relief for the victims of discrimination.  Id. at 771, 96 S. Ct. at 1267.  The union in that case, like the appellees in the case before us, objected to retroactive competitive seniority benefits for the discriminatees, claiming that such relief would affect the rights of employees who had not been victims of discrimination.  Id. at 773, 96 S. Ct. at 1268.  The Court stated:

> Certainly, there is no argument that the award of retroactive seniority to victims of hiring discrimination in any way deprives other employees of indefeasibly vested rights conferred by the employment contract.  This Court has long held that employee expectations arising from a seniority system agreement may be modified by statutes furthering a strong public policy interest.

8

<u>Id</u>. at 778, 96 S. Ct. at 1271.[10]   Because claims under Title VII

"involve the vindication of a major public interest," <u>id.</u> at 778

n.40, 96 S. Ct. at 1271 n.40 (quoting Section-By-Section Analysis

of H.R. 1746, accompanying the Equal Employment Opportunity Act of

1972 Conference Report, 118 Cong.Rec. 7166, 7168 (1972)),

appellees' assertion that an award of retroactive seniority

benefits impairs their contractual rights cannot defeat an

otherwise valid consent decree.[11]   Rather, to object successfully

_____

[10]   The Court explained:

> [I]t is apparent that denial of seniority relief to identifiable victims of racial discrimination on the sole ground that such relief diminishes the expectations of other, arguably innocent, employees would if applied generally frustrate the central "make-whole" objective of Title VII. These conflicting interests of other employees will, of course, always be present in instances where some scarce employment benefit is distributed among employees on the basis of their status in the seniority hierarchy. . . . Accordingly, we find untenable the conclusion that this form of relief may be denied merely because the interests of other employees may thereby be affected.

<u>Franks</u>, 424 U.S. at 774-75, 96 S. Ct. at 1269.

[11]   The appellees' -- and the majority's -- reliance upon contract expectations protected by Florida law thus is unavailing.   The economic expectations of the current employees and provisions of Florida law protective of employment benefits cannot trump the rights granted to all workers by Congress in Title VII.   <u>See</u> U.S. Const. art. VI.   Moreover, the majority's insistence that appellees would be unfairly burdened by the proposed consent decree ignores the impact of the City's past discrimination upon the seniority ladder appellees seek to protect.   The controversial provision  in the consent decree awarding retroactive seniority would merely restore incumbent employees to the place in the hierarchy that they would have occupied absent discrimination.   <u>See</u> <u>Franks</u>, 424 U.S. at 767, 96 S. Ct. at 1265 ("A concomitant award of the seniority credit [that a discriminatee] presumptively would have earned but

9

to a decree between consenting parties, the objecting party must show that the challenged consent decree has disposed of a legal claim or imposed legal obligations or duties upon that party. This appellees have not done.

The majority's reliance upon White v. Alabama, 74 F.3d 1058 (11th Cir. 1996), is misplaced, as well. In White, a class of African-American voters sued alleging that the at-large scheme for electing state appellate judges diluted the voting strength of African-American voters, and the class requested relief in the form of a proportional representation scheme. Another plaintiff intervened, purporting to represent a class of African-American voters and seeking single-member districts. The court of appeals invalidated a final order of the district court that the parties to the case categorized as a consent decree; the order would have provided in large part the relief sought by the initial class of plaintiffs and thus would have denied the relief sought by the

_____

for the wrongful treatment would also seem necessary in the absence of justification for denying that relief."). The majority's suggestion that the rights of incumbent employees would be diminished by the decree much as would be "the rights of a pedestrian in a crosswalk . . . by a runaway truck" ignores the actual victims of discrimination in this case, who merely hope to obtain the relief that Congress has provided and that the Supreme Court unequivocally has stated is available to victims of illegal discrimination. See id. at 774, 96 S. Ct. at 1269. Indeed, "the State has the power to eradicate racial discrimination and its effects in both the public and private sectors, and the absolute duty to do so where those wrongs were caused intentionally by the State itself." City of Richmond v. J.A. Croson Co., 488 U.S. 469, 518, 109 S. Ct. 706, 735 (1989) (Kennedy, J., concurring in part).

10

intervenors despite their objections to the decree. The court of appeals invalidated the decree approved by the district court because it would have "provide[d] relief beyond that authorized by Congress" in the Voting Rights Act. White, 74 F.3d at 1074. In addition, and of relevance to the appeal before us, the court in White distinguished Local No. 93 because the objecting party in White was a plaintiff prosecuting a cause of action. Whereas in Local No. 93 the "union's sole reason for intervening in the case . . . was to protest the settlement," White, 74 F.3d at 1075 n.53, in White the settlement would have disposed of a cause of action properly raised in the objector's pleadings, see id. at 1073 n.49 (noting that the nonconsenting party intervened as a plaintiff and filed a complaint alleging that "he represented a class consisting of all of Alabama's black voters" and seeking relief in the form of an order mandating single-member districts for the election of Alabama appellate judges, relief that was "totally inconsistent" with that sought by the other plaintiff class).

White thus recognized the uncontroversial proposition that a court may not resolve by a settlement order the pleaded claims for relief of a party before the court without that party's consent. See Local No. 93, 478 U.S. at 529, 106 S. Ct. at 3079 ("A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors; if properly raised, these claims remain and may be litigated by the

11

intervenor."). In the case before us, however, the objecting parties did not present any claim for relief to the district court, but rather joined the action solely to protest the proposed settlement. Local No. 93 expressly held that the refusal of such a party to consent to a proposed settlement does not invalidate the agreement, as long as the party had a chance to "present evidence and have its objections heard at the hearings on whether to approve the consent decree." Local No. 93, 478 U.S. at 529, 106 S. Ct. at 3079. The district court thus erred in concluding that it could not approve the consent decree over appellees' objections.

B.

The majority holds that the contractual rights of the objecting parties -- parties who are not prosecuting a legal claim for relief in this action, see White, 74 F.3d at 1075 n.53, and who thus cannot preclude entry of the consent decree, see Local No. 93, 478 U.S. at 528-29, 106 S. Ct. at 3079 -- may be affected only after a "trial on the merits." In Local No. 93, however, the Supreme Court squarely held that the union that objected to the consent decree could not preclude its entry simply because there had been no trial on the merits. The district court's fairness hearing in that case sufficed to justify entry of the decree, notwithstanding the union's argument that it would affect the contractual expectations of its members. The Court stated:

12

> Here, Local No. 93 took full advantage of its opportunity to participate in the District Court's hearings on the consent decree. It was permitted to air its objections to the reasonableness of the decree and to introduce relevant evidence; the District Court carefully considered these objections and explained why it was rejecting them. Accordingly, "the District Court gave the union all the process that it was due . . . ."

478 U.S. at 529, 106 S. Ct. at 3079 (quoting Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 400, 102 S. Ct. 1127, 1136 (1982)). As in the case sub judice, the district court in Local No. 93 had conducted a fairness hearing to consider the propriety of the proposed consent decree. See Local No. 93, 478 U.S. at 508, 106 S. Ct. at 3068. It is clear, then, that a district court may enter a consent decree despite the objections of a party after conducting a fairness hearing at which the objector "is entitled to present evidence and have its objections heard,"[12] Local No. 93, 478 U.S. at 529, 106 S. Ct. at 3079, even if the decree modifies "employee

---

[12] Local No. 93 did not create a broad right of intervenors to a quasi-trial, but rather simply required a district court conducting a fairness hearing to allow a party objecting to a proposed settlement agreement to "present evidence and have its objections heard." 478 U.S. at 529, 106 S. Ct. at 3079. Contrary to the assertion of the majority, the district court thus was under no obligation to permit the Suau objectors to cross-examine the United States' expert witness or to conduct discovery. The majority also suggests that the Suau objectors were not permitted to offer statistical evidence of their own. This assertion finds no support in the record; indeed, the Suau objectors do not contend on appeal that they were denied the opportunity to "present evidence and have [their] objections heard" because they were given an opportunity to do so at the fairness hearing. See R3 at 22-29 (transcript of 8/11/94 fairness hearing). Moreover, the Suau objectors in fact presented their objections to the proposed consent decree and filed a notice of their objections with the district court. See Order at 5.

13

expectations arising from a seniority system agreement," Franks, 424 U.S. at 778, 96 S. Ct. at 1271.[13] City of Miami is not to the

---

[13] In addition, a finding by the district court of a prima facie case of discrimination that is supported by the record is sufficient to justify race-conscious relief. See Howard v. McLucas,871 F.2d 1000, 1006 (11th Cir.), cert. denied, 493 U.S. 1002, 110 S. Ct. 560 (1989); Kirkland, 711 F.2d at 1130 ("[A] showing of a prima facie case of employment discrimination through a statistical demonstration of disproportionate racial impact constitutes a sufficiently serious claim of discrimination to serve as a predicate for a voluntary compromise containing race-conscious remedies."); see also Croson, 488 U.S. at 500, 109 S. Ct. at 725 (holding that city set-aside plan lacked strong basis in evidence because "there [was] nothing approaching a prima facie case of constitutional or statutory violation by anyone in the Richmond construction industry"); Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 277, 106 S. Ct. 1842, 1848 (1986) (holding that district court should respond to challenge to race-conscious relief by making "a factual determination that the employer had a strong basis in evidence for its conclusion that remedial action was necessary"). The district court's finding of a prima facie case in the case before us was made in the course of consideration of the proposed settlement agreement. A district court's task in reviewing such an agreement is to ascertain that "the proposal represents a reasonable factual and legal determination based on the facts of the record, whether established by evidence, affidavit, or stipulation" and that any effect on third parties is "neither unreasonable nor proscribed." City of Miami, 664 F.2d at 441; accord City of Alexandria, 614 F.2d at 1362. In this case, the district court's reliance upon the statistical evidence presented in an affidavit by an expert represented "a reasonable factual and legal determination" as a predicate for a decision whether to approve a settlement agreement. City of Miami, 664 F.2d at 441. Moreover, the district court's finding is supported by the record. The statistical evidence showed a stark disparity between the percentage of blacks available in the relevant labor markets and the number of blacks employed. See supra, Section I.A n.3; Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 307-308, 97 S. Ct. 2736, 2741 (1977) ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination."); Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 339-340 n.20, 97 S. Ct. 1843, 1856 n.20 (1977). Appellees' argument that the United States did not establish an evidentiary basis sufficient to justify race-conscious relief thus is without merit.

contrary, see 664 F.2d at 447 ("[I]n the absence of either a trial or an examination . . . by the district court, we are not prepared to hold that the consent decree is valid insofar as it deprives the [union] and its members of the benefit of the promotion procedure . . . .") (emphasis added), and, to the extent that the majority reads it to be so, it cannot bind this court, see Local No. 93, 478 U.S. at 529, 106 S. Ct. at 3079. The district court's conclusion that it lacked the authority to approve the proposed consent decree under these circumstances[14] thus was erroneous.

C.

The district court also based its decision refusing to approve the proposed consent decree upon a finding that the decree was unfair to incumbent employees. Because the majority concludes that the consent decree impermissibly would have compromised the rights of the objectors, the majority does not decide whether the district court's conclusion that the decree was unfair is supportable under applicable law. Because I believe that the majority's conclusion is incorrect, I address the district court's alternative basis for refusing to approve the decree.

The Supreme Court stated in Franks that

> the denial of seniority relief to victims of illegal racial discrimination in hiring is permissible "only for reasons which, if applied generally, would not frustrate the central

---

[14] See Order at 12-13 ("The Court finds that approval in the face of these objections would not be appropriate because the Court cannot bind non-consenting parties to a consent decree.").

> statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."

424 U.S. at 771, 96 S. Ct. at 1267 (quoting Albermarle Paper Co. v. Moody, 422 U.S. 405, 421, 95 S. Ct. 2362, 2373 (1975)). Indeed, the Court stated that "the issue of seniority relief cuts to the very heart of Title VII's primary objective of eradicating present and future discrimination in a way that backpay, for example, can never do." Id. at 768 n.28, 96 S. Ct. at 1266 n.28. "[O]rdinarily such relief will be necessary to achieve the 'make-whole' purposes of [Title VII]." Id. at 766, 95 S. Ct. at 1265.

The district court here held that the proposed agreement was unfair to incumbent employees because it would have an "unusual, adverse impact."[15] Specifically, the district court relied in large part upon its conclusion that incumbent employees' "vested, contractual rights will be diminished."[16] As the United States argues, however, contractual rights of the incumbent employees would not be altered under the proposed agreement; rather only the relative position of those employees in the hierarchy would be affected -- and no more so than would have occurred absent discrimination. Cf. Franks, 424 U.S. at 767, 96 S. Ct. at 1265 ("A concomitant award of the seniority credit he presumptively

---

[15] Order at 17.

[16] Order at 16.

16

would have earned but for the wrongful treatment would also seem necessary in the absence of justification for denying that relief."). The Court explained,

> [I]t is apparent that denial of seniority relief to identifiable victims of racial discrimination on the sole ground that such relief diminishes the expectations of other, arguably innocent, employees would if applied generally frustrate the central "make-whole" objective of Title VII. These conflicting interests of other employees will, of course, always be present in instances where some scarce employment benefit is distributed among employees on the basis of their status in the seniority hierarchy. . . . Accordingly, we find untenable the conclusion that this form of relief may be denied merely because the interests of other employees may thereby be affected.

Franks, 424 U.S. at 774-75, 96 S. Ct. at 1269.

The district court also based its conclusion upon the "strong likelihood . . . that an atmosphere of hostility and animosity would arise between the incumbent employees and the incoming victim class."[17] The opposition or hostility of incumbent employees to remedial measures for victims of discrimination, however, is not a valid basis upon which to deny relief. See, e.g., Local No. 93, 478 U.S. at 511, 106 S. Ct. at 3069 (affirming district court's approval of consent decree despite union's objection that relief would cause "serious racial polarization"); Equal Employment Opportunity Comm'n v. Rath Packing Co., 787 F.2d 318, 335 (8th Cir.) (holding that district court abused its discretion in denying retroactive seniority and rejecting employer's claim that relief

---

[17] Order at 18.

17

would "lower employee morale" because "[t]hese consequences can be expected in almost all Title VII cases"), cert. denied, 479 U.S. 910, 107 S. Ct. 307 (1986).

The district court's reasons for finding that the proposed settlement agreement was unfair thus lack a basis in law. Although the standard of appellate review of a district court's refusal to approve a consent decree is "not crystal clear," see Stovall, 117 F.3d at 1240, a district court's order premised solely upon an erroneous interpretation of the law merits reversal whether the court of appeals reviews the decision de novo or for abuse of discretion.[18] This is particularly so in light of Congress's "strong preference for encouraging voluntary settlement of employment discrimination claims," see Carson, 450 U.S. at 88 n.14, 101 S. Ct. at 998 n.14, a preference that could be defeated if district courts were given unbridled discretion "to impose their views of reasonableness . . . on settlements reached by the government agencies responsible for the enforcement of Title VII rights," City of Alexandria, 614 F.2d at 1362. Because the district court erroneously believed that the consent decree

---

[18] In Stovall v. City of Cocoa, 117 F.3d 1238, 1240 (11th Cir. 1997), the court concluded that a court of appeals should "tailor the standard of review to the district court's rationale for rejecting the proposed consent decree." The court distinguished a legal determination by the district court "that a proposed decree would be unlawful," which should be subject to de novo review, from "a conclusion that a proposed decree would be unreasonable or unfair," which should be reviewed for abuse of discretion. Id.

18

impermissibly would burden the appellees' rights, misapprehended the law with respect to non-consenting parties and consent decrees, yet made findings adequate to support remedial retroactive seniority for the victims of discrimination, I would hold that the district court's decision refusing to approve the consent decree should be reversed.

## II.

Because the majority affirms the district court's judgment refusing to approve the consent decree, the majority does not address the cross-appeal of the Suau objectors, who contend that the district court erred in concluding that the United States demonstrated a prima facie case of discrimination. I disagree with the majority's resolution of the merits of the United States' appeal, however, and accordingly conclude that the cross-appeal is not moot and should be addressed.

The United States contends that this court lacks jurisdiction over the Suau objectors' cross-appeal challenging the district court's finding of a prima facie case of discrimination because the objectors do not appeal from a final order, see 28 U.S.C. § 1291, or from an order denying them injunctive relief, see 28 U.S.C. § 1292(a)(1); Carson, supra. Because the Suau objectors do not -- and could not -- claim that the district court's finding that the United States established a prima facie case was a final order under section 1291, they can seek appellate review of that finding

19

only if the finding independently satisfies section 1292(a)(1), discussed supra, or if the finding is so related to the ruling appealed by the United States as to be "inextricably intertwined" with that ruling.  See Swint v. Chambers County Commission, 514 U.S. 35, 115 S. Ct. 1203, 1212 (1995).

This court lacks jurisdiction over the cross-appeal independent of its jurisdiction over the United States' appeal because a finding that the United States established a prima facie case of discrimination is not a denial of injunctive relief appealable under section 1292(a)(1).  See Equal Employment Opportunity Comm'n v. Pan Am. World Airways, Inc., 796 F.2d 314, 316-17 (9th Cir. 1986), cert. denied, 479 U.S. 1030, 107 S. Ct. 874 (1987); accord Shee Atika v. Sealaska Corp., 39 F.3d 247, 249 (9th Cir. 1994).  This court thus can entertain the cross-appeal only if it is essential to the resolution of, or inextricably intertwined with, the United States' appeal.

In Swint, the Supreme Court reversed a decision of a panel of the Eleventh Circuit that impermissibly had exercised appellate jurisdiction over a claim merely pendent to a reviewable collateral order.  Although recognizing that the Court had not "universally required courts of appeals to confine review to the precise decision independently subject to appeal," 115 S. Ct. at 1211, the Court made clear that "there is no 'pendent party' appellate jurisdiction," id. at 1212.  The Court did not settle "whether or

20

when it may be proper for a court of appeals with jurisdiction over one ruling to review, conjunctively, related rulings that are not themselves independently appealable," id., because the parties in Swint did not -- and could not -- contend that the district court decision in question was "inextricably intertwined" with the decision over which the court of appeals properly had jurisdiction or that "the former decision was necessary to ensure meaningful review of the latter," id. Although the Court in Swint specifically addressed the scope of appellate jurisdiction over collateral orders, see Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S. Ct. 1221 (1949), the language of the opinion is broad enough to encompass appeals brought pursuant to section 1292(a)(1) as well.

It is a close question whether this court enjoys appellate jurisdiction over the cross-appeal. In determining whether resolution of the correctness of the district court's finding that the United States established a prima facie case of discrimination is "necessary to ensure meaningful review" of the United States' appeal, Swint, 115 S. Ct. at 1212, over which we have jurisdiction, this court should consider whether the district court's conclusion effectively is a predicate to our conclusion on the merits of the United States' appeal. Because an evaluation of the merits of the United States' appeal necessarily involves reference to, and reliance upon, the district court's finding that the United States

21

established a prima facie case justifying race-conscious relief, see supra, Section I.C n.13, this court arguably can exercise appellate jurisdiction over the cross-appeal.

Of course, as the United States argues, the Suau objectors' cross-appeal may be characterized more properly as an alternative argument for affirmance in the main appeal, in which case this court may review the claim. Because the Supreme Court in Swint made clear that a court of appeals should not readily exercise jurisdiction over "related rulings that are not themselves appealable," 115 S. Ct. at 1212, and because I address the substance of the cross-appeal in my discussion of the merits of the United States' appeal, see supra, Section I.C n.13, I would hold that this court lacks the authority to review independently the district court's conclusion that the United States established a prima facie case of discrimination.

## III.

In my view, the majority has misapplied the law in affirming the district court's refusal to approve the proposed consent decree. Because I believe that the proposed decree permissibly would provide relief for the victims of discrimination and that the district court lacked a basis in controlling law to refuse to approve the decree, I would reverse the decision of the district court and remand with instructions for the court to approve the proposed decree.

22

Accordingly, I respectfully DISSENT from Sections III.B and III.C of the majority opinion.